Good morning, Your Honors. May it please the Court, I am Rob Schwartz on behalf of the Commodity Futures Trading Commission. First of all, thank you for holding argument on an expedited basis. We understand the Court is busy and we appreciate the accommodation. This is a civil enforcement action against five defendants that we refer to collectively as Monex. The complaint alleges that Monex is operating an illegal unregistered trading platform where members of the public can speculate on the price of precious metals. The complaint also alleges that Monex is defrauding those customers through false statements and material omissions. The reason we're here today is because when the District Court applied the relevant statutory provisions, that's sections 6C1 and 2C2D of the Commodity Exchange Act, the District Court did not apply the text of the statute. As a result, it misinterpreted both provisions. As a result, it created a split of authority on both provisions. And so the upshot is that not only did that derail this enforcement action, it's caused a great deal of confusion nationwide, really, about the scope of the statute. So and in fact, since the District Court issued the decision, two other District Courts have rejected it outright. So all we're asking the Court to do simply is to end the confusion by restoring what Congress wrote in 2010 and what the President signed into law, not what the District Court eight years later thought that Congress was really driving at. Has no circuit court ruled on this yet? The 11th Circuit ruled on the 2C2D issue. It held that in order to satisfy the requirement that each transaction result in actual delivery, the seller has to transfer possession and control of the commodity. There has not been a start there and then move on to Section 2C2D. But of course, if the Court has some other preference, I can go that way. Our first argument is the simplest, and it's a little bit hard to emphasize without belaboring and repeating ourselves, but the text means what it says. It prohibits any manipulative or deceptive device in connection with various commodity transactions. There's only one way to read that. It is a phrase with a very long pedigree. Congress borrowed it directly from Section 10B of the Securities Exchange Act of 1934. The District Court acknowledged that, but ultimately it did not give any weight to the plain meaning of the statute. It recited the plain meaning rule and then moved past based on a 1956 case called De Silva. Monax calls it Ballantyne. It's De Silva versus Ballantyne, same case. That was a case about a statute that the Supreme Court said three times was ambiguous, and in that case, the agency administering the statute, which was the Copyright Office, expressed, quote, substantial doubt about what the statute meant. This is an unambiguous statute, manipulative or deceptive. There are no two ways to read that. And the agency has no question. Scaliar. The District Court said that or means and here, I guess. Yeah. It cited that this De Silva versus Ballantyne case, it was a statute that plausibly the use of or could have conferred a right on everybody on either side of the or. So it was about inheritance of the right to renew a copyright. And the statute said it belongs to the author, but if the author is deceased, then to the widow, widower, or children. And the widow argued that this was an order of preference. It went from the widow to the widower to the preference, but probably not both in the same case. But the Court said, well, you know, it appears more likely that Congress meant that the right belonged to any of these three people, so the widow could renew the copyright or the children could renew the copyright. It's a great leap from that to a situation where Congress takes well-established language, 75 years of jurisprudence at the time Congress adopted it, and stretched this idea that Congress is sometimes careless and writes or when it really means and. And in this particular case, is manipulation off the table? It's a we do not allege manipulation. So it's this is any deceptive act. It's traditional fraud. The provision 61 says something else that's very important, which takes it completely out of this de silva, sometimes Congress's careless doctrine. It delegates to the CFTC to define what constitutes a manipulative or deceptive device by regulation. And we did that. So the statute looks the relevant language just like Section 10b of the Securities Exchange Act. So we drafted our regulation to look quite a bit like SEC Rule 10b-5. In the case of an express delegation by Congress, the standard is very, very high to upend an agency's regulation. It controls unless it is arbitrary and capricious or manifestly contrary to the statute. This Court has said that manifestly contrary to the statute means that the statute must be clear, unambiguous, and in conflict with the regulation. And there's simply no way to get there in this case. The statute is disjunctive. The regulation is disjunctive. The statute looks like Section 10b. The regulation looks like Rule 10b-5. There is no way to meet the standard that these two are in irreconcilable conflict. You know, as for the regulation, it is very, very clear on its face, not only because it borrows the operative text from Rule 10b-5. It's just phrased in four parts, three of which are relevant here. And it's not really even disputed that at least two of those, quote, could be read more broadly to include fraud. Now, we submit there's only one way to read those, and that they do prohibit fraud. We've talked a little about the Kraft case, which was a district court decision about out of the Northern District of Illinois, which said the only way to read 180.1a.1 was that it prohibits separately manipulation, use of a manipulative scheme, use of manipulative or, excuse me, fraudulent scheme, fraudulent manipulation, fraudulent device. That's just one of these things. And it certainly at least wasn't manifest to that court that it only prohibits manipulation. It wasn't manifest to Judge Weinstein in the Eastern District of New York that this statute only prohibits manipulation. And I'm speaking only for myself, but the or argument seems a little more straightforward than the second argument about the delivery in terms of your time. Absolutely. I'm happy to move along. Only seven minutes left. Yeah. Yeah. I'd like to reserve some of that, too. The statute requires that each transaction results in actual delivery. Monex doesn't meet that standard because the only thing that a transaction on this Atlas platform results in is the delivery of a slip of paper, a trade confirmation. The big picture is important here because the purpose of this statute is to distinguish between financial trading platforms for speculation that have gone, you know, there's been a long history of evasion here by various companies that try to do this, and real bona fide vendors of commodities. If you want to sell metal to customers who want to possess it, that's fine. So the sequence here in the causation matters a lot because the purposes of the actual delivery exception is to allow me to buy some metal and have them then ship it to me. If the metal in this case, as it is, is sitting in the same vault the whole time before, during, and after the transaction. But there is such a place that they have this metal. Correct. Which is a good start, but having it so that you could deliver it to somebody in the future isn't good enough. You have to make actual delivery as a result of the transaction. But do you have to put it in a different warehouse or whatever place they keep things like this? Move it from warehouse A to warehouse B once there's a purchase? Not good enough under the 11th Circuit's test. And they just put a sticker and say all this in this corner belongs to Mr. Smith. Not good enough under the 11th Circuit's test, and we submit that's right. You have to actually, the customer's got to be able to go and get it. Okay? If you're actually selling metal, the customer's got to, here the customer gets no metal. They can't go inside and look at it, can't inspect it. The customer has no contractual relationship with the depository. So yeah, the metal exists, but the test is not whether it exists. It's whether the seller actually delivers it. And I want to talk specifically about these short trades. It doesn't need to show up on their doorstep. No, no. It could be an agent. It could be, no, it doesn't have to go to their place of business. But the seller has to relinquish control. Otherwise, you're just running an unregulated trading platform. All they have to do is register. They could be in this business. They register, they conduct this business on a registered exchange. It's fine. So this is not to snuff out this industry. It's just to bring it into the regulatory light of the Commodity Exchange Act. Now, I don't want to eat up too much of my time without saving any for rebuttal. But I don't understand exactly why, what you think that they should do when they handle these great big quantities of metals or whatever they're handling, like gold. They have a warehouse full of gold, and you buy out five tons of it. Where do you put it? First of all, yeah. Can they put that over in the corner and say, this belongs to Smith, and he can come pick it up? They have not transferred physical possession then, nor have they transferred control. So, and especially if it doesn't happen as a result of the transaction, it doesn't meet any real definition of actual delivery. Our definitions overlap. We and the 11th Circuit say you have to transfer possession and control. Monix agrees that you have to transfer possession, but Monix doesn't do that. The metal sits in the same vault before, during, and after the transaction, because it's a trading platform. It's not a place to go and buy metal. You know, I don't know what a customer would want to do with it, but it has to be transferred to the customer, to the customer's agent, to somebody acting on behalf of the customer. It can't just sit there, because Congress's purpose was to accept businesses that actually deliver metal, rather than conduct trading activity for the general public without the kinds of protections that they get under the CEA. Well, in commodities like soybeans or something like that, how do they do that to just trade it? You buy the soybeans, and they say it's in the truck number 10 out on the rail siding or something like that? It sure could. I mean, we have a similar example in the Federal Register releases of companies that sell home energy products, and they bill the customer periodically. This is a finance transaction. And those products actually get consumed. So, you know, when I send, if I'm a home heating oil company, I send it to the customer, they burn it. I can't go get it back, but, you know, I run a credit check on this person. I do what companies ordinarily do when they finance something. It's, the meaning of these terms do not depend on what you are buying or how you are paying. And the 11th Circuit talked about it. They looked at it, plain meaning, went to a dictionary, figured out what actual delivery meant, and they said, quite sensibly, that it requires you to transfer something, possession of it, and control of it. And that's just not, neither of those things is happening here. You could do that by additional agreement? Could you do that? Could you transfer it? Well, it's situated somewhere to begin with, so everybody agrees it exists. Yeah. And would delivery, if you, if the buyer wanted the delivery to remain where it was, could you do that through an agreement such that there would be actual delivery? And I could go get it at some point if I wanted, but maybe I don't want to. I just want it to sit there. Well, if you have that ability, if the customer can go and get it, then, yes. Or direct it to be gotten. I'm sorry. Or direct it to be gotten. Or direct it to be gotten, right. I mean, that looks much more like an actual purchase of goods and articles, rather than this setup where there's long and short trades. The short trades are particularly interesting because the fiction there is that it's the customer responsible for actually delivering the metal. So, it's metal that the customer never owned, never possessed, never had control over. The fiction there is that it's the customer actually delivering it to Monax, which it has to be actual delivery, not a constructive delivery. You want to save your remaining money? I would. Thank you. Thank you, Your Honor. Neil Gatner for appellees. I'd like to get to the wording of the statute, both statutes, and sink this conversation into the statute, because the statute has meaning. But first of all, I want to get one stipulated fact below. And the stipulated fact, and this is that SCR supplemental record, is that the CFTC has said there's no dispute that the metals are there and that they remain in the depository until the debt is paid. That is what the regulation provides for. And that is what Congress specifically directed. And that is what is in the CFTC guidance. So let's go back to what happened. This is Section 2C2D talks about both an expansion of jurisdiction to margin finance sales and also an exception. And an actual delivery has to be considered in that context. Now, actual delivery also has to be considered in the context of what Congress said. And I'm talking about in terms of the committee that dealt with this. And the committee transcript is the document to which the CFTC directed all industry participants to understand what Congress meant. And, therefore, we cited to the committee transcript of the House, and the representative of the NFA, the National Futures Association, was the sponsor of that act. And Dan Roth made it quite clear that when he had actual delivery in mind, he was thinking of Monarchs. And not only that, you had Congressman Marshall, and that was on SCR, SCR 204. And on top of that, Marshall, Congressman Marshall, also discussed actual delivery in terms of what Monarchs was doing. Monarchs had a representative at that committee, on the record, a hearing, and also, in addition to the NFA, the CFTC was there. The acting head of enforcement was there. Sotomayor to determine that the statute is ambiguous before we go crawling through all the legislative statements. Gershengorn The statute is not ambiguous, but under general dynamic. Sotomayor Well, if it's not ambiguous. Gershengorn It's actual delivery. Sotomayor Well, I'm just saying if it's not ambiguous, we wouldn't really be looking back at these various statements. Gershengorn Well, what general dynamic says is that even before you get to Chevron deference and the questions of ambiguity, you take a look at the devices that you  have at its disposal to consider what Congress meant. And in this case, in addition to taking a look at the fact that they had margined finance transactions involved, that's how you have to look at it. And you also need to look at also what they were suggesting when they were trying to get rid of actual delivery to a depository. They made that proposal to the Senate. It actually passed the Senate, and then it was rejected. And what happened was, and this is very strong evidence of what Congress meant, and what happened was they wanted to do actual delivery as Monax was doing it and as was Monax was doing it since 1987. And that's what Dan Roth said. We don't want to interfere in what Monax is doing. And not only was this specifically discussed in the committee meeting numerously in numerous times, but then Congress, and namely the committee members, actually directed the NFA, the CFTC, and the Monax to get together with the head of the committee, the lawyer who is the chief of staff, and get together and speak about coming up with what the statute should look like. And after discussing Monax's actual delivery, lo and behold, in the statute came actual delivery. And they did that. Are you saying that you were involved in actual delivery even before this came up before Congress? Your Honor, yes. And not only that. Still doing the same thing. Exact same thing. And not only that, the CFTC, who was at that meeting, at that committee meeting, did two investigations of Monax's actual delivery. It's on the record. And that's also cited in our papers. And they passed on it. They allowed Monax to keep on doing actual delivery. Okay. When you have a you involve a sale and somebody buys 10 tons of whatever they're getting, how do they get delivery of that? Do they get some kind of a bill of sale or some kind of a bill of lading, and then they can go to this warehouse and pick up the metals? They can do that. They get title. They get title, and that passes as required under the model code. And they can pick up the metal whenever they want. They have complete control of the metal in the depository, complete control. All they have to do is pay off what they owe. And that's exactly what was contemplated. And the thing that you're holding it in trust if they come by and pick it up. Well, they have title. There are documents. It's title in fungible metal. But you can't move it. They can't move it out immediately. They can move it whenever they want. They can have it delivered to their house. Feasible, really. They can have it delivered. That's what they're suggesting. But are you equating the title with delivery? No. Okay. It's part of delivery. But they can have it delivered only after they satisfy the margin, right? No. It's delivered. It's delivered to the depository. And they have control of it. They have title. And then under the law, they can withdraw it from the depository any time they want? Yes. They can take physical possession whenever they want. All they have to do is pay what they owe. It's just like you said. Well, that's what I mean. Yeah. What they owe. I mean, that's the --" that's, you know, if they bought it on a margin, then, you know, they have the margin, right? Precisely. Well, then they can't take delivery. No. They can't take physical possession. It's delivered under the statute to the depository, and title passes. And that is where it's supposed to be delivered. And not only that, if you look at Example 2, under the final guidance that we cited to, that's exactly what the CFTC has said. There's no --" if you take a look at SER 275 and 277 and look at Example 2, you'll see it. And in the same --" if you also look at the 2011 CFTC request for comments, you'll see that the CFTC directed, as I mentioned before, all industry participants to go to this committee transcript which explains actual delivery, which was based on the Monarch's model. And that was and obviously, you cannot give people who borrow fungible product --" I mean, who buy a fungible product like gold, you can't give it to them, because  And that's what Congress had in mind. And Congress specifically rejected the CFTC's alternative approach, where there would be no delivery to a depository. Delivery to the depository is delivery under the Act. That has always been the CFTC's position since 19 --" since the Act was passed, and it was consistent with what happened for the last 20 years before that. There is no dispute about this. And when they're talking about Hunter, Weiss, which was another case that came down after the Is the depository, in your case, independent from Monarchs or any Monarchs affiliated company? Completely. Is it independent, like a what? Like a bonded warehouse or something like that? Yes. It's completely independent. Although the --" I should just say, parathetically, that the final guidance from the CFTC says there are possibilities where the depository could be connected with the lender. But Monarchs is scrupulous about this and followed exactly what the CFTC said. All right. I should move on. Well, let me ask you, why does it say actual delivery as opposed to delivery? Because it's exactly the issue we're talking about. Because what Congress was concerned about were all these Ponzi schemes, you know, and they talked about it in the committee transcript, which said there was delivery, but it was constructive delivery. It wasn't actual delivery, like the case they're talking about, Hunter, Weiss. There, there was no actual delivery of the metal because Hunter, Weiss never received the metal to deliver to the customers. And what happened was, and I'm sorry this has occurred and the CFTC has been pushing this, what they're doing is they are attempting to use a decision that is not controlling in this case, has nothing to do with this case, and they've been using it in these other cases that they've been pushing. We've been asking, I'm asking, we asked Judge Sillner, we asked this Court to please take a look at the legislation and the legislative history and all the rules you apply when you're considering what the statute says. And we think it's clear enough. Can I move on to the next issue? And so let's talk about this next issue. And the next issue has to do about 6C1. Again, we ask you to look at the statute, that phrase, in the context of the entire statute and understand what they're attempting to do. I'm not going to get into, in my few minutes, the canons of construction and how when you look at that, when you look at the wording that they're relying on in the context of the statute itself, their spin on that phrase, taken out of context, is implausible and silly. They haven't even responded to the fact that this read of 6C1 would entirely nullify that part of the statute, 2C, 2D, that we're talking about, which exempts Monex. Monex is exempted. Now they're trying to get it back in under CFTC jurisdiction by relying on 6C. You can't nullify a statute like that. We also talk about, I'm not going to go beyond this, Jesson already pointed it out, under their reading, it would absolutely make superfluous 6C3, which deals with non-fraudulent manipulation. It is so clear, it is so clear under the statute and any statutory construction that Congress did not mean anything close to an expansion of CFTC jurisdiction to cover every commodity being traded in grocery stores and which have nothing to do with the futures market. It was always the law, and always CFTC doctrine, that jurisdiction over commodities and when I say commodities, I mean cash commodities, was for one limited purpose. That was when it dealt with the bad actors trying to manipulate prices in the markets, whether those markets be futures or the cash commodity. And that, there's no dispute about that. They acknowledge that. So when Congress was considering the amendment, both Senator Lincoln and Senator Cantwell were absolutely clear that it was designed to deal with an increasing problem with manipulation of the markets. There is no suggestion in the statute or anywhere that the CFTC had jurisdiction general fraud jurisdiction with 6C1, no suggesting and no suggestion that the expansion was for all commodities. And I'd just like to direct your attention, for instance, to Congress, to Senator Cantwell's May 6, 2010, comments, which really focused on manipulative devices or contrivances. And on top of that, Senator Lincoln also talked in that session, and that is not in the record, and we didn't cite to it because we lacked the time, we lacked the space to give you all the citations and all the discussion, but that's on page 3349 of the register. But it's in the same group of comments. And we also would direct you to tab or ER-98, which gives the ER-98, which gives the explanation of what Congress was doing. And in that just two columns, two columns of that page, which discusses what the significant, she made clear that in two of the sections, 741 of Dodd-Frank, 742, there was general anti-fraud jurisdiction and talked about retail industry. 742, by the way, overruled the Ninth Circuit's decision in White Pine. And there, what Congress did in Dodd-Frank was to make sure that fraud, anti-fraud, would be in the Act. However, what they did with respect to 753, which was the Act that dealt with the manipulation point, they said nothing about fraud. He made it clear it was manipulation. And also, and that's all he said, so if they wanted to make this section 6C1 a general anti-fraud statute, they knew how to do it. And they specifically, in the other two sections, discussed how they were making sure that the statutes dealt with retail consumer fraud. They didn't do that with 6C1. They never intended to do it. And if you need any further confirmation of this, if you look at our brief and you look at the statements from the CFTC in their 180.1 interpretation, it makes it real clear that they were talking about fraud and manipulation, which impacts prices. I don't have too much time left. I just want to point out that Senator Cantwell told a full Senate chamber that this is to be interpreted like Section 10B of the Securities Exchange Act. So to deny that that prohibits fraud is not only to assume that Senator Cantwell didn't know that 10B is an anti-fraud statute, but that all the rest of the Senators, the supermajority that voted for the Dodd-Frank Act, were also unaware, or anybody who heard it and considered the speech. I want to talk about, if I don't have too much time, but Monex's lobbying efforts on the Hill that they rely on. Monex's lobbying failed, okay? Sotomayor, you know, we're not here to look at their lobbying efforts or we're here to interpret the statute. Thank you. Yes. And we heard a lot about a lot of things but the text of the statute. I would also point out we discuss in our brief example 2 in the interpretation. Monex is not following it. I see my light is red. If I can finish the point. That is something I wanted to ask about is your comment in response to his comments on example 2. So you may do that and then if there's any other questions. Okay. Otherwise, that will conclude your time. Example 2 says you have to deliver the commodity during the 28 days, the 28-day period. They're not doing that. They are keeping it in a vault before, during, and after. And the interpretation talks about when you start counting the 28 days. It says that you start counting. But you're saying you can't get it out of the vault with the four 28 days? I think — I'm not sure I understand the question. If it's delivered. It's — they're saying that can be delivery because you can make arrangements for transfer, which one might distinguish from delivery, at any time. I think you hear the word delivery in its ordinary sense used two ways. Sometimes one is, you know, you bought something from me. I take it over to the place of your choosing. Sometimes the thing is immobile, like you build a condo building and delivery is expected on, you know, summer 2019. When delivery happens, you can go in the condo and close the door. So I think that's a fair reading of delivery. If the customer wants it there, that's fine. But in that sense, there really is a transfer of control and not — And you think title — The point is that whatever — Title transfer, the title and ability to retrieve it is not enough. Title transfer and the ability to retrieve it would — yeah. I think so. That doesn't happen here. I mean, Monax tried to make the opinion that you can go and get it — make the point that you can go and get it whenever you want. But you have to end — you have to end the transaction before you can do that. You know, you cannot have a financed piece of metal. And the idea that — yes? When you say they keep it locked up in a vault, whose vault is that? It is a third party with a contractual relationship only with Monax. So if the customer shows up and says, I want to come inspect my metal, make sure it's there, they don't know who the customer is. So this is — the fact that it's a company that is not the same company as Monax really doesn't make any practical difference from the perspective of the customer. Did that answer your question, Judge Tsushima? Yeah, but the customer, as Judge McEwen, I think, just asked, can get delivery from that vault, right? Not as Monax has set it up until they pay off the financing. Yes, right. It's only — it's only after that. And, you know, it's important that the orders are the thing that result. Yeah, sure, the stuff was physically delivered to the vault at some point during the life of the building that acts as a depository. That's not good enough. That's — Well, what it turns out to be, I mean, another way to look at it is Monax retains a security interest in this commodity that's in the separate vault. Sure, as the car that — the company that financed my car retains a security interest in that. There's no problem with my driving it off the lot. Are you saying it's unlawful of Monax to have that security interest? Not the security interest, but holding on to it. You are — every day we consumers make transactions where there is a security interest retained in the item that they're driving off with. And, you know, the idea that it's — They can have a security interest, but it can't be a possessory interest. Correct, except to the extent that the customer has the right to go and get it. And they can't go get their metal here. And that's — it's a financial trading platform masquerading as a vendor of goods and articles. Any other questions? All right. Thank you. Thank you. Thank you. For the argument this morning, U.S. Commodity Futures Trading Commission versus Monax is now submitted. And we are adjourned. Thank you.
judges: Siler, Tashima, McKeown